# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-2350

_____

United States of America

*Plaintiff - Appellee*

v.

Christopher Howes

*Defendant - Appellant*

_____

No. 25-2523

_____

United States of America

*Plaintiff - Appellee*

v.

Salvador Caracena-Zarates, also known as Doe

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 17, 2026
Filed: July 10, 2026
[Unpublished]
_____

Before LAVENSKI R. SMITH, BENTON, and ERICKSON, Circuit Judges.
_____

PER CURIAM.

This consolidated appeal concerns sentencing challenges by codefendants convicted of drug distribution offenses. First, Christopher Howes challenges the substantive reasonableness of his above-Guidelines 100-month sentence for aiding and abetting in the distribution of fentanyl. Second, Salvador Caracena-Zarates challenges the district court's[1] imposition of a two-level dangerous weapon enhancement and a four-level aggravating role enhancement, resulting in a 300-month sentence for possession with the intent to distribute more than 50 grams of methamphetamine. We affirm.

I. *Background*

Federal authorities charged Howes and Caracena-Zarates with several drug offenses based on a controlled substance investigation in Northwest Arkansas. Count 1 charged Caracena-Zarates, Howes, and Rafael Norwood with knowingly conspiring to distribute fentanyl. Howes was also charged with nine separate counts of distributing or aiding and abetting the distribution of fentanyl. Additionally, Howes, along with Norwood, was charged with two counts of concealment money laundering. In addition to the conspiracy count, Caracena-Zarates was charged with two counts of distributing fentanyl.

---

[1]The Honorable Timothy L. Brooks, Chief Judge, United States District Court for the Western District of Arkansas.

## A. *Howes*

Howes pleaded guilty to one count of aiding and abetting in the distribution of fentanyl. Per the statement of facts in the plea agreement, Howes arranged with a confidential source (CS) to provide the CS "with 100 fentanyl pills [one] evening." Howes R. Doc. 39, at 2. Howes obtained the fentanyl for the CS from coconspirator Norwood and immediately met the CS "with 100 fentanyl pills in exchange for $2,200 in official buy funds." *Id.* at 3.

Following Howes's guilty plea, the probation office prepared a presentence report (PSR). Based on uncontested sentencing facts, including Howes's stash house use and drug quantity (720 fentanyl pills), the PSR established his total offense level at 23. Howes's countable prior convictions set his criminal history as category I. His advisory Guidelines range was 46 to 57 months' imprisonment.

At sentencing, after hearing the parties' arguments on an appropriate sentence, the district court analyzed the 18 U.S.C. § 3553(a) factors. The district court noted the "serious[ness] [of] the fentanyl crisis" and the statistics reporting the number of deaths from fentanyl usage. Howes R. Doc. 93, at 18. It considered "the offense of distributing fentanyl into [the] community to be . . . . [an] aggravating" factor. *Id.* The district court considered Howes's total drug quantity, his escalation of drug dealing, the danger to the public, the seriousness of the offense, and the nature of the enterprise with which he was affiliated.

The district court recognized several mitigating circumstances. It noted that Howes's distributions involved no violence or firearms. The district court recognized that Howes had no qualifying criminal history and thus benefitted from the zero-point offender reduction. The district court also viewed Howes's drug addiction history as mitigating, which began as early as age five with alcohol and progressed to marijuana, cocaine, crack, and opiates. He also used methamphetamine to counteract the lows occasioned by his daily use of fentanyl. The district court recognized additional mitigating factors, including his eventual

acceptance of responsibility, his family support, and his attainment of a GED and skills in HVAC and electrical construction.

As for sentencing disparity, the district court remarked that it considered not only the Judicial Sentencing Information data, which indicated an average sentence of 28 months, but it had also considered its own sentencing practices. The court noted that it often "var[ies] upward in sentencing fentanyl distributors" based on the seriousness and lethality of fentanyl. *Id.* at 23. Given that Howes was "dealing 100-pill quantities on multiple . . . occasions"; that "[o]ver 700 pills" were located in the stash house; and that the drug distribution "went on for a long period of time," resulting in the distribution of "over 1,400 pills," the court found that a "[G]uideline[s] range of 46 to 57 months" was "too low." *Id.* at 24. Sentencing Howes within that range "would certainly produce . . . an unwarranted disparate result compared to [the] [c]ourt's sentencing practices in other fentanyl distribution cases." *Id.*

After reviewing the statutory sentencing factors, the district court concluded that "this is a case where the [G]uideline[s] range gets it wrong and the [c]ourt finds it necessary to vary upward to achieve a sentence that is sufficient, but not greater than necessary, to achieve and to meet the parsimony principle." *Id.* at 24–25. The district court sentenced Howes to 100 months' imprisonment.

### B. *Caracena-Zarates*

Caracena-Zarates initially pleaded not guilty, but he subsequently waived indictment and entered a guilty plea to an information. The information charged that he knowingly and intentionally possessed with intent to distribute more than 50 grams of a mixture or substance containing methamphetamine. His plea agreement's statement of facts noted that law enforcement executed a search warrant at a residence used by Caracena-Zarates to meet with coconspirators and located "various items of drug paraphernalia," as well as "various suspected fentanyl pills, suspected methamphetamine, suspected Alprazolam pills, mushrooms, and marijuana edibles." Caracena-Zarates R. Doc. 46, at 3. Subsequent testing indicated

-4-

that the suspected methamphetamine was "a mixture of methamphetamine with a total approximate weight of 136.09 grams." *Id.*

Following Caracena-Zarates's guilty plea, the probation office prepared a PSR. The PSR identified Caracena-Zarates as the source for fentanyl pills that Norwood distributed. Norwood "estimated that he would be supplied with a few hundred twice per month. Norwood admitted that he paid Caracena-Zarates approximately $2.00 per pill." Caracena-Zarates R. Doc. 96 ¶ 290. Norwood stored the pills that he obtained from Caracena-Zarates in the stash house. *See id.* ¶ 285 ("When asked where the fentanyl pills were in the s[t]ash location, Norwood responded, 'It's in there.' Norwood then stated that the fentanyl pills were in the bathroom of the stash house."). Norwood then supplied the fentanyl pills stored in stash house to Howes for later sale.

The PSR also summarized the activities of Caracena-Zarates and his coconspirators established through surveillance and wiretaps. These intercepts recorded threats that he made to Norwood and his girlfriend after Norwood's girlfriend destroyed Norwood's supply of drugs at the stash house, thereby frustrating Norwood's ability to repay Caracena-Zarates. In another intercepted call, Caracena-Zarates directed Norwood to go to Norwood's residence and instructed him to have no one with him. Additionally, the PSR detailed law enforcement's execution of search warrants at various addresses in Fayetteville and Ft. Smith associated with the conspiracy. The searches discovered documents with Caracena-Zarates's name and drugs, drug paraphernalia, firearms, and ammunition.

Caracena-Zarates's PSR calculated his base offense level as 30. The PSR assessed a two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance pursuant to U.S.S.G. § 2D1.1(b)(12); a two-level increase for committing the offense as part of a criminal livelihood pursuant to U.S.S.G. § 2D1.1(b)(16)(E); and a four-level enhancement for being an organizer or leader of a criminal activity involving five or more participants pursuant to U.S.S.G. § 3B1.1(a). After a reduction for acceptance of

responsibility, Caracena-Zarates's total offense level was 35. Based on a total offense level of 35 and a criminal history category of VI, the PSR calculated an advisory Guidelines range of 292 to 365 months' imprisonment.

The government and Caracena-Zarates lodged objections to the PSR. The government asserted that a two-level dangerous weapon enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) should apply. Caracena-Zarates contended that it was improper to assess him with the criminal livelihood enhancement or the aggravating role enhancement for being a leader or organizer of the criminal conduct.

At sentencing, the government called Drug Enforcement Administration Task Force Officer Jerred Rankin to testify in support of the enhancements. Officer Rankin testified that using the wire intercepts, law enforcement intercepted "one particular call where [Caracena-Zarates's girlfriend] Kaitlyn Cain and [Caracena-Zarates] talked about drug prices for mushrooms as well as what an ounce of mushrooms would go for, and then other various drugs as well." Caracena-Zarates R. Doc. 107, at 15. According to Officer Rankin, during that call, Caracena-Zarates "explained that he was selling marijuana and he was kind of directing Kaitlyn Cain on prices and kind of what to do." *Id.* at 15–16.

Following Officer Rankin's testimony and after hearing the parties' arguments, the district court sustained the government's objection and directed the probation office to file an amended final PSR incorporating that additional two-level dangerous weapon enhancement. The district court based its decision to apply the enhancement on undisputed facts in the PSR plus the testimony received at the sentencing hearing. The district court concluded that the firearms were possessed, that it was not clearly improbable that they were possessed in connection with the drug-trafficking activities occurring during the case, and that "[Caracena-]Zarates either knew or should have known that guns were possessed for the purpose of furthering the objectives of the conspirators' drug-trafficking conduct." *Id.* at 37.

The district court next overruled Caracena-Zarates's objection to application of the four-level aggravating role enhancement. Specifically, the court concluded that the record facts supported a finding of Caracena-Zarates as an organizer or leader of Cain, his girlfriend, as well as coconspirators Norwood and Joshua Ladd. Additionally, the district court overruled Caracena-Zarates's objection to the criminal livelihood enhancement.

The district court recalculated Caracena-Zarates's Guidelines range. After the addition of the dangerous-weapon enhancement, his total offense level increased to 37. Combined with his criminal history category of VI, his advisory Guidelines range was 360 months' to life imprisonment. That range, however, was capped by the statutory maximum of 480 months. After hearing argument from the parties and considering the § 3553(a) factors, the court varied downward and imposed a sentence of 300 months' imprisonment.

## II. *Discussion*

On appeal, Howes challenges the substantive reasonableness of his above-Guidelines 100-month sentence. Caracena-Zarates challenges the district court's imposition of the two-level dangerous weapon enhancement and the four-level aggravating role enhancement.

## A. *Howes*

Howes argues that the district court abused its discretion by varying above the advisory Guidelines range of 46 to 57 months' imprisonment to a sentence of 100 months. *See United States v. Weatherspoon*, 174 F.4th 592, 596 (8th Cir. 2026) ("We review the substantive reasonableness of the court's sentence under a deferential abuse-of-discretion standard."). He asserts that his sentence is greater than "the national average for similarly situated defendants." Howes's Br. 5. He also maintains that his sentence was a proportionally greater upward variance than codefendant Alonzo Releford, who was also sentenced to 100 months' imprisonment. According to Howes, sentencing him to the same sentence as Releford is substantively unreasonable given that Howes's total offense level was 23 and Releford's was 27.

We hold that the district court did not abuse its discretion by varying upward and sentencing Howes to 100 months' imprisonment. "The record shows the court fully considered the § 3553(a) factors" and Howes's mitigating arguments. *United States v. Grandberry*, 835 F. App'x 157, 157 (8th Cir. 2021) (unpublished per curiam). It thoroughly explained to Howes why "the fentanyl guidelines produce ranges that are, in [the court's] view, skewed to a starting base offense level that is way too low." Howes R. Doc. 93, at 23. Based on this policy disagreement, the district court explained that "this is a case where the [G]uideline[s] range gets it wrong and the [c]ourt finds it necessary to vary upward to achieve a sentence that is sufficient, but not greater than necessary, to achieve and to meet the parsimony principle." *Id.* at 24–25. The district court was entitled to "vary from the [G]uidelines based on its own policy disagreements with those [G]uidelines." *United States v. Cortez*, 72 F.4th 1344, 1345 (8th Cir. 2023) (holding the district court did not abuse its discretion in imposing an above-Guidelines sentence based on its policy disagreement with Guidelines' treatment of fentanyl).

Furthermore, the district court provided defendant-specific reasons for imposing an upward variance. It acknowledged the mitigating circumstances in Howes's case but nonetheless found that Howes's Guidelines range inadequately accounted for his specific aggravating factors. Those activities included a drug quantity involving over 1,400 fentanyl pills, 700 of which were in a stash location; distribution of fentanyl in public places over a long period of time; and distribution of more potent substances like Xylazine. *See United States v. Anderson*, 90 F.4th 1226, 1227 (8th Cir. 2024) ("A district court has wide latitude in weighing relevant factors, including discretion to assign more weight to the offense's nature and circumstances than to the defendant's mitigating personal characteristics." (citation modified)).

Finally, although Howes takes issue with his sentence being the same as Releford's, "[t]he statutory directive in § 3553(a)(6) to avoid sentencing disparities refers to national disparities, not to differences between co-conspirators, so

[Howes's] argument founds on a mistaken premise." *United States v. Armstrong*, 39 F.4th 1053, 1059 (8th Cir. 2022). In addition, the record shows that Howes and Releford are not similarly situated. Releford's controlled buys occurred at his residence. *See* Howes R. Doc. 62, at 45–48. By contrast, Howes's distribution activities occurred in "one of the most densely populated areas in Fayetteville" and in public locations that exposed "innocent people" to injury should the drug deal go bad. Howes R. Doc. 93, at 19. Additionally, law enforcement's investigation into Howes showed that he had been selling for a period of months, while Releford's controlled buys were comparatively brief. *See* Howes R. Doc. 62, at 45–48. Finally, Howes distributed more dangerous substances than Releford, including Xylazine.

## B. *Caracena-Zarates*

Caracena-Zarates challenges the district court's application of dangerous weapon and aggravating role enhancements. "We review a district court's application of the Guidelines de novo, and factual findings are reviewed for clear error." *United States v. Anderson*, 618 F.3d 873, 879 (8th Cir. 2010).

### 1. *Dangerous Weapon Enhancement*

First, Caracena-Zarates argues that the district court erred in applying a dangerous weapon enhancement by "finding that it was reasonably foreseeable to [him] that his co-conspirators possessed firearms in connection with the drug-trafficking conspiracy." Caracena-Zarates's Br. 27.

Section 2D1.1(b)(1) mandates a two-level increase in a defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed." The enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A). The two-level enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Id.* "For § 2D1.1(b)(1) to apply, the government must prove two things—(1) the gun was possessed and (2) it was not clearly improbable that the weapon was connected to the drug offense." *Anderson*, 618 F.3d at 880. The government must establish these elements by a

preponderance of the evidence. *United States v. Young*, 689 F.3d 941, 946 (8th Cir. 2012). In summary, § 2D1.1(b)(1) "creates a very low bar for the government to hurdle. If it is 'not clearly improbable' that the firearm was connected to [the defendant's] drug activity, then the enhancement applies." *Anderson*, 618 F.3d at 882.

We hold the district court correctly applied the enhancement. The facts belie Caracena-Zarates's argument. The record shows that he both possessed the firearm and it was not clearly improbable that it could be used in relation to the drug activities.

### a. *Possession*

"To prove that the firearm was 'possessed,' the government need not prove ownership of either the weapon or the premises on which it is found for a § 2D1.1(b)(1) enhancement to apply." *Anderson*, 618 F.3d at 879. Nor does the government have to prove that the defendant was "observed using the weapon." *Id.* at 880 (quoting *United States v. Payne*, 81 F.3d 759, 762 (8th Cir. 1996)). "Lack of proof of use or actual possession does not preclude a § 2D1.1(b)(1) adjustment; constructive possession is sufficient." *United States v. Atkins*, 250 F.3d 1203, 1213 (8th Cir. 2001) (citation modified). "Possession may be constructive, if it was reasonably foreseeable that a co-conspirator would have possessed a weapon." *United States v. Brewer*, 624 F.3d 900, 907–08 (8th Cir. 2010) (citation modified). "Under the advisory [G]uidelines' relevant conduct principles, '§ 2D1.1(b)(1) may be applied based on a co-conspirator's reasonably foreseeable possession of a firearm in furtherance of jointly undertaken criminal activity.'" *United States v. Sterling*, 942 F.3d 439, 443 (8th Cir. 2019) (quoting *United States v. Delgado-Paz*, 506 F.3d 652, 655 (8th Cir. 2007)).

Caracena-Zarates does not dispute that coconspirators Ladd and Norwood possessed firearms or that those firearms were kept close to the drugs in locations where part of the conspiracy took place—Ladd's residence and the stash house. *See* Caracena-Zarates's Br. 29–30. Instead, he challenges his constructive possession of firearms. We hold that the government proved by a preponderance of the evidence

through testimony and unobjected-to facts in the PSR that Caracena-Zarates constructively possessed firearms. Here, his coconspirators' possession of those firearms was reasonably foreseeable to him. First, as the district court noted, Caracena-Zarates possessed a 9-millimeter round of ammunition at the residence located at 395 North Assembly Drive in Fayetteville, Arkansas; this ammunition was found in a bedroom containing documents bearing his name, a digital scale, suspected MDMA pills, marijuana edibles, loose marijuana, methamphetamine, and fentanyl pills. Based on these undisputed facts, the district court reasonably inferred that "since one does not typically have a need for ammunition unless one has a corresponding firearm, . . . [Caracena-Zarates] possessed a firearm related to his drug-trafficking activity." Caracena-Zarates R. Doc. 107, at 33.

Second, officers discovered two firearms when searching Ladd's residence. One of those firearms—the black, semi-automatic .22 caliber rifle with a loaded magazine—was in plain view on top of clothing on the floor in Ladd's bedroom. Ladd told investigators "that Caracena-Zarates had resided at 3519 North 27th Street, Fort Smith, Arkansas[,] for approximately . . . 5 or 6 years." Caracena-Zarates R. Doc. 96 ¶ 240. Although Ladd did not believe that Caracena-Zarates had "handled" the guns seized from Ladd's residence, *id.* ¶ 245, he admitted "that both [he] and [Caracena-Zarates] would distribute drugs out of the residence," Caracena-Zarates R. Doc. 107, at 34. Based on these facts, the court did not err in finding that it was reasonably foreseeable to Caracena-Zarates that Ladd would possess a firearm in furtherance of their drug-trafficking activities.

Third, the same is true for coconspirator Norwood. Norwood admitted that he owned the firearms found at the stash house. That stash house contained fentanyl that Caracena-Zarates "expected Norwood to protect." *Id.* at 36.

In light of these facts, the court did not clearly err in finding that it was reasonably foreseeable that Norwood would possess a firearm in furtherance of their drug-trafficking activities.

b. *Not Clearly Improbable*

"Once a district court has found that a gun was possessed during commission of the offense, the court must impose the § 2D1.1(b)(1) enhancement unless it is clearly improbable that the weapon was connected to the offense." *Anderson*, 618 F.3d at 880. "We have long held that the firearm must be connected with the criminal activity before its possession can be used to enhance the defendant's sentence." *Id.* at 880–81. To "prove that the weapon was connected with the offense," the government can "show[] that a temporal and spa[t]ial relation existed between the weapon, the drug trafficking activity, and the defendant." *Id.* at 881 (citation modified). As to "the character of this connection, the government need not show that the defendant used or even touched a weapon to prove a connection between the weapon and the offense." *Id.* (citation modified).

We hold that the government proved that it was not clearly improbable that the firearms were connected to Caracena-Zarates's drug activity. The facts set forth *supra* concerning Caracena-Zarates's constructive possession of the firearms also establish "that a temporal and spatial relation existed between the weapon[s], the drug activity, and [Caracena-Zarates]." *Id.* Accordingly, we affirm the district court's imposition of the dangerous weapon enhancement.

2. *Aggravating Role Enhancement*

Next, Caracena-Zarates argues that the district court clearly erred in finding that his conduct "r[o]se to the level of leader/organizer" for purposes of the aggravating role enhancement. Caracena-Zarates's Br. 28. He maintains that he never used others as intermediaries to distribute drugs to his customers, exercised control over how others distributed drugs to their customers, or demanded a larger portion of the profits.

Under U.S.S.G. § 3B1.1(a), a four-level aggravating role enhancement applies "[i]f the defendant was an organizer or leader of a criminal activity that involved

five or more participants or was otherwise extensive."[2] We "broadly interpret[]" "the terms 'organizer' and 'leader.'" *United States v. Brown Bull*, 138 F.4th 1083, 1089 (8th Cir. 2025) (citation modified). In determining whether a defendant qualifies as an organizer or leader, the district court considers the following factors:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* (quoting U.S.S.G. § 3B1.1, cmt. n.4).

"Typically, this enhancement applies to a defendant who employs or otherwise arranges for intermediaries to sell his drugs." *United States v. Miller*, 91 F.3d 1160, 1163 (8th Cir. 1996). It is not necessary for the defendant to "directly control his intermediaries. But, if the words 'organizer' and 'leader' are to have their ordinary meaning, a defendant must do more than sell for resale." *Id.* at 1164 (citation modified). "In a drug conspiracy case . . . it is enough if the defendant assumed organizing or leading functions such as recruiting others, determining the price or location of sales, and so forth." *Brown Bull*, 138 F.4th at 1089 (ellipsis in original) (quoting *United States v. Willis*, 433 F.3d 634, 636 (8th Cir. 2006)). "For this enhancement to apply, 'the defendant need organize or lead only one other participant.'" *Id.* (quoting *Willis*, 433 F.3d at 636).

We hold that the district court did not clearly err in finding that Caracena-Zarates was an organizer or leader of the drug-trafficking organization. The district court based its decision on the unobjected-to facts in the PSR and testimony at the sentencing hearing, which showed that Caracena-Zarates had significant

---

[2]Caracena-Zarates "concedes that the conspiracy involved five or more participants." Caracena-Zarates R. Doc. 107, at 38.

involvement with, and control over, other members of the drug-trafficking organization, including Cain, Norwood, and Ladd.

In summary, as the district court concluded, the organizational structure of the drug trafficking organization—what the district court termed a "hub and spokes" system—indicated Caracena-Zarates's role in the organization. The investigation revealed that "[Caracena-]Zarates was the connection. He was the hub." Caracena-Zarates R. Doc. 107, at 49. We affirm the district court's application of the aggravating role enhancement.

### III. *Conclusion*
Accordingly, we affirm the judgments of the district court.

_____